UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA                  :

            - Against -                                  :

MADARS JANKEVICS                               :     S11 16 CR. 692-06 (JMF)

                   Defendant.               :
------------------------------------------------------------X

Defendant's Sentencing Memorandum

Dated:     New York, New York
             February 22, 2019

                                                    Jeremy Schneider
                                                    Rothman, Schneider,
                                                      Soloway & Stern, LLP
                                                    100 Lafayette Street, Ste. 501
                                                    New York, New York 10013
                                                    (212) 571-5500

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA            :

    - Against -                     :    Defendant's Sentencing
                                         Memorandum
MADARS JANKEVICS,                   :
                                         S11 16 Cr. 692-06 (JMF)
            Defendant.              :
------------------------------------------------------------X
```

## INTRODUCTION

Defendant MADARS JANKEVICS is presently scheduled for sentencing before your Honor on March 8, 2019 at 11:00 a.m., following his guilty plea to Count One of the Indictment, Conspiracy to Commit Bank and Wire Fraud, in violation of 18 U.S.C. § 1349. This memorandum is submitted in support of Mr. Jankevics' request for a sentence of 36 months' imprisonment, and a reasonable period of supervised release. Mr. Jankevics is a 33-year-old man born and raised in Latvia, and the father to an 8-year-old son whom he financially supported prior to his arrest. He has worked hard his entire life to provide for his family, but unfortunately suffered financial difficulties in the recent years leading up to his involvement in the offense. He will likely be deported to Latvia following his release from custody. In light of the factors discussed herein, it is submitted that the requested sentence would be sufficient to promote the statutory goals and purposes of criminal sentencing provided under 18 U.S.C. § 3553(a).

## DISCUSSION

I. **The Plea Agreement and the Advisory Federal Sentencing Guidelines**

In Mr. Jankevics' plea agreement with the government, the parties agreed that the loss amount attributable to Mr. Jankevics' conduct was more than $250,000 but less than $500,000, which, pursuant to USSG § 2B1.1(b)(1)(F), requires a 12-level increase to the defendant's base offense level of seven. This 12-level increase, in combination with other adjustments, including Mr. Jankevics' acceptance of responsibility, resulted in the Total Offense Level calculation of 22. Mr. Jankevics has no criminal history and therefore stipulated to a Criminal History Category of I. A Total Offense Level of 22 and Criminal History Category of I yields an advisory Federal Sentencing Guideline range of 41 – 51 months' imprisonment.

A final Presentence Report (PSR), prepared by U.S. Probation Officer Johnny Kim, was filed on January 2, 2019. Despite the parties' plea agreement, the PSR calculates a loss amount between $550,000 and $1,500,000 and states that the increased loss amount is based upon information that was obtained upon further investigation of the instant offense, information which had not been disclosed to the defendant until the filing of the final PSR. (PSR ¶ 43) This loss amount requires a 14-level increase (as opposed to 12), making Mr. Jankevics' Total Offense Level 24 (as opposed to 22), and increasing his Guidelines range to 51 – 63 months. (PSR ¶¶ 43, 52, 50, 63, 99, 100; PSR at 21)

3

While the Court is not bound by the parties' plea agreement, we respectfully request that the Court apply the stipulated Guidelines range of 41 – 51 months' imprisonment. The increased loss amount applies to the scheme as a whole, and is not the result of any additional criminal conduct of the defendant or specific loss amount specifically attributable to the defendant. Additionally, several of Mr. Jankevics' co-conspirators who have already been sentenced received the benefit of Guidelines ranges that were in part determined by the originally calculated loss amount of $250,000 – $550,000. Finally, the originally calculated loss amount was a significant factor in reaching plea negotiations, and the government agreed that a Guidelines range of 41 – 51 months imprisonment was appropriate despite the fact that its investigation of the offense remained ongoing.

However, regardless of which Guidelines range the Court adopts, it is respectfully submitted that a below-Guidelines sentence of 36 months' imprisonment is appropriate in this case.

## II.     18 U.S.C. § 3553(a): A Reasonable Sentence

Section 3553(a)(2) provides that criminal sentences must be "sufficient, but not greater than necessary" to "comply" with the need for retribution, deterrence, incapacitation, and rehabilitation. The effect of this "overarching provision," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007), is to ensure that sentences are imposed with the understanding that the advisory Guidelines are a "marker on the path toward a reasonable sentence" but are "no longer necessarily the ultimate destination on that path," *United States v. Jasper*, 2005 WL 2414547, at *6

4

(S.D.N.Y. 2005). *See also United States v. Dorvee*, 616 F.3d at 182 (2d Cir. 2010) ("Even where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors.").

In *United States v. Fernandez*, the Second Circuit noted that "[c]onsideration of the § 3553(a) factors is not a cut-and-dried process of factfinding and calculation; instead, a district judge must contemplate the interplay among the many facts in the record and the statutory guideposts." 443 F.3d 19, 29 (2d Cir. 2006). In this case, for the reasons provided below, and for those to be addressed at the time of sentencing, the Guidelines call for an excessive sentence that would be "greater than necessary" to advance the § 3553(a) sentencing objectives.

Additionally, it should be noted that the applicable Guidelines range in this case is largely a product of the 12-level or 14-level loss amount enhancement provided under § 2B1.1(b). In *United States v. Algahaim*, the Second Circuit analyzed the Guidelines' "loss amount" enhancement provisions, noting that:

> the [U.S. Sentencing] Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss. Instead the Commission. . . let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider.

5

842 F.3d 796, 800 (2d Cir. 2016) (citing *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)). "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly," the Second Circuit held, "that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Algahaim*, 842 F.3d at 800.

A. <u>Mr. Jankevics' Personal History and Family Circumstances</u>

Madars Jankevics is 33 years old and was born and raised in Kuldiga, Latvia. Madars was raised by a single mother, Jineta Jankevica, and his maternal grandparents. He has one maternal half-sister, Agnese Bunka, age 27. Madars' father left before he was born; they have never met and Madars does not even know his father's name. Growing up, Madars never asked about his father, but always felt the emotional and physical void left from his absence. Without financial support from Madars' father, his mother and grandparents worked hard to try to provide Madars and his sister with a stable life – his mother worked as a seamstress, his grandfather was a metal worker, and his grandmother a store clerk – but they struggled financially. When Madars was around 10 years old, his mother married Artis Erpe, who moved into the home. Sadly, Madars' mother died of pulmonary problems in August 2016, and his stepfather died in the summer of 2018 while Madars was incarcerated on the instant matter.

After graduating high school in 2004, Madars attended one year of vocational school and then began working as a taxi driver. In 2006, Madars met Evija Priedola, whom he married in 2008, and in 2010, Evija gave birth to their son, "VJ,"

6

who is now eight years old. Around this time, in the wake of economic downturn in Latvia, Madars was not earning enough as a taxi driver to support his young family. He began searching elsewhere for work and eventually accepted a position as a day laborer at a fish processing plant in Scotland. While it pained him to leave his wife and son in Latvia, Madars did what he believed was best for his family and moved to Scotland for the next six months. In early 2011, an employment agency in Latvia referred Madars to a more lucrative job opportunity as a construction laborer in England. Although he wished to return to his family, Madars accepted the job so that he could continue providing for his wife and son. However, the family continued to struggle financially, and when Madars returned to Latvia in 2012, their financial difficulties had put an unresolvable strain on Madars' relationship with Evija. He also learned that she had been unfaithful to him while he was in England, and they decided to divorce. Thereafter, Madars' son resided with Evija (who has since remarried) while Madars continued to provide financial support.

From 2012 to 2016 Madars remained in Latvia so he could be close to his family and continued working in construction, but job opportunities were scarce. He worked sporadically as jobs became available, but by October 2016 it became more difficult to find work. Unfortunately, this led Madars to move to the United States and become involved in the instant offense.

Also in October 2016, prior to moving to the United States, Madars began a relationship with Dace Liepa, age 26. They met in Kuldiga and Dace was living with

7

Madars in Florida at the time he was arrested. She has since returned to Latvia and remains supportive of Madars throughout this case.

Because Madars' entire family resides in Latvia, he has spent the last eleven months in custody at the Metropolitan Correctional Center and Valhalla without having a single visitor and with limited communication with his family. He has not seen his wife or eight-year-old son in over a year. The extreme separation from Madars' family has been emotionally difficult for him, creating an even greater sense of isolation while in custody. Of course, this is the consequence of Madars' involvement in the instant offense; however, he does remain in a distinguishable position from most of his fellow-inmates who have easier access to family visitation and phone calls. Furthermore, it should be noted that the defendant was unable to provide family letters to include with this submission due to the difficulty of communicating with his family in Latvia. Notably, counsel has had limited communication with Madars' wife, who has expressed her concern for him.

In consideration of the defendant's family circumstances, including the separation from his family in Latvia, and his need to financially support his 8-year-old son, it is respectfully submitted that a sentence of 36 months' imprisonment is sufficient but not greater than necessary.

B. <u>The Nature and Circumstances of the Offense</u>

Mr. Jankevics accepted responsibility for his offense conduct by promptly pleading guilty before Your Honor on October 11, 2019. He recognizes the seriousness of his actions and is remorseful to the victims whose lives have been

impacted by the financial losses caused by the offense. Because this Court has previously sentenced a number of co-conspirators and is therefore familiar with the facts and circumstances of this case, as well as the facts detailed in the PSR and in Mr. Jankevics' plea agreement and allocution, this memorandum will not recount them in great detail. However, there are circumstances unique to Mr. Jankevics' offense that should be evaluated in fashioning an appropriate punishment. These circumstances are not presented as protestations of Mr. Jankevics' innocence or as an attempt to excuse his criminal behavior or to shift blame to others. Rather, they are mentioned as mitigating factors, relevant to his conduct and his overall character, which should be considered in formulating a reasonable sentence.

Mr. Jankevics has no criminal history, his conduct did not involve violence or threats of violence, and, remarkably, he has received no disciplinary infractions during his eleven months of incarceration. Having resided in Latvia, where there was little opportunity by way of employment, Mr. Jankevics felt pressured by the responsibility of having to provide for his young son as work opportunities in Latvia decreased over the years. His involvement in the instant offense seemed to him, at the time, to be the only way to earn money to provide for his family. While this of course does not excuse Mr. Jankevics' conduct, it does provide context for his poor decision-making.

Nonetheless, Mr. Jankevics was not a leader, manager, or supervisor of the offense, but was one of the "lower men on the totem pole," and was recruited by higher-ups in the conspiracy who directed his conduct. His conduct consisted of

9

creating shell corporations and three commercial bank accounts, from which he withdrew funds to provide to co-conspirators in Europe. Mr. Jankevics did not orchestrate the scheme or create or manage the fraudulent advertisements, and he did not communicate directly with the victims. Additionally, as noted in the PSR, the majority of the withdrawn funds were wired or transported to Europe (PSR ¶ 17). Mr. Jankevics received minimal profits from the offense conduct, and far less than the loss amount for which he has accepted responsibility.

C. <u>Avoiding Unwarranted Sentencing Disparities</u>

Some of Mr. Jankevics' co-defendants have already been sentenced by Your Honor after having pled guilty to similar or more serious conduct than Mr. Jankevics. A sentence of 36 months' imprisonment is an appropriate sentence that takes into account Mr. Jankevics' culpability with that of his co-defendants and their respective sentences.

Most similarly situated to Mr. Jankevics are his co-defendants Aleksandrs Mukans and Ivars Ozols, who, like Mr. Jankevics, were neither leaders, managers nor supervisors of the offense. According to the government, Ozols created two shell corporations and corresponding back accounts and withdrew funds from the accounts as they were deposited by victims, conduct similar to Mr. Jankevics'. (*See* Gov't Sentencing Submission, Doc. 221, *United States v. Ivars Ozols*, 16 Cr. 692 (JMF) (January 22, 2019) at 2-3). Also like Mr. Jankevics, Ozols stipulated to a Guidelines range of 41 – 51 months' imprisonment based upon a loss amount of more than $250,000 but less than $550,000; however, Probation also recalculated

Ozols' loss amount as being more than $550,000 but less than $1,500,000, thus increasing his Guidelines to 51 – 63 months' imprisonment. *Id.* at 3-4. In its sentencing submission, the government recommended that the Court apply the stipulated Guidelines range. *Id.* at 1, 3-4. As the Court is aware, Your Honor sentenced Ozols to a below-Guidelines sentence of 39 months' imprisonment.

Aleksandrs Mukans was sentenced by Your Honor on February 16, 2018 to a below-Guidelines sentence of 36 months' imprisonment. (PSR ¶ 9) Mr. Mukans' Guidelines range was 41 – 51 months and he was responsible for a total loss amount of more than $250,000 but less than $550,000. (PSR ¶¶ 9, 43) Mukans' conduct was also similar to Mr. Jankevics in that he opened bank accounts in the name of shell corporations from which he withdrew funds and then provided those funds to his co-conspirators overseas. (*See* Government Sentencing Submission, Doc. 95, *United States v. Aleksandrs Mukans*, 16 Cr. 693 (JMF) (February 7, 2018) at 1)

Additionally, the Court should consider the sentences imposed on Mr. Jankevics' co-defendants, Janis Klava, Kristaps Beresnevics, and Emils Mors, who acted as managers or supervisors within the offense. The Presentence Report states:

> Klava, Beresnevics, and Mors each acted as a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive [and] each directed and/or provided guidance for co-conspirators who participated in the scheme, including instructions on opening bank accounts, providing necessary documents to establish these bank accounts, and withdrawing funds in structured amounts from the accounts.

11

(PSR ¶ 44) Additionally, Beresnevics, Mors and other co-conspirators "provided the withdrawn funds to Klava, who then transferred the funds to co-conspirators in Europe." *Id.*

As the Court is aware, Beresnevics, who pleaded guilty to an additional charge of aggravated identity theft, whose supervisory role in the scheme was "quite significant", and who helped "coordinate the fraud at a higher level", had a Guidelines range of 81 – 95 months' imprisonment, and received a below-Guidelines sentence of 66 months' imprisonment. (*See* Sentencing Transcript, Doc. 83, *United States v. Kristaps Beresnevics*, 16 Cr. 692 (JMF) (December 12, 2017) at 12:2-8; PSR ¶ 7) Mors, who absconded after his initial arrest and continued to engage in criminal activity, had a Guidelines range of 57 – 71 months and was sentenced by Your Honor to 57 months' imprisonment. (PSR ¶¶ 6, 37) Klava, who was a leader within his respective "circle" of the conspiracy had a Guidelines range of 57 – 71 months and was sentenced by Your Honor to 66 months' imprisonment. (*See* Sentencing Transcript, Doc. 101, *United States v. Janis Klava*, 16 Cr. 692 (JMF) (January 30, 2018) at 9:13-21; PSR ¶ 8)

When viewing the sentences imposed on Mr. Jankevics' co-defendants in tandem with Mr. Jankevics' Guidelines and individual role in the offense, a below-Guidelines sentence of 36 months' imprisonment is appropriate in this case.

CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that Mr. Jankevics be sentenced to a term of 36 months' imprisonment and a reasonable period of supervised release.

Dated:     New York, New York
             February 22, 2019

                                                / s /
                                     Jeremy Schneider
                                     Rothman, Schneider,
                                          Soloway & Stern, LLP
                                     100 Lafayette Street, Ste. 501
                                     New York, New York 10013
                                     (212) 571-5500

TO:    CLERK OF THE COURT
        United States District Court
        Southern District of New York
        500 Pearl Street
        New York, New York 10007

        HON. JESSE M. FURMAN
        United States District Court
        Southern District of New York
        40 Foley Square
        New York, New York 10007

        MATTHEW J.C. HELLMAN
        Assistant United States Attorney
        Southern District of New York
        One St. Andrews Plaza
        New York, New York 10007