

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 1, 2019

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *United States* v. *Madars Jankevics*, 16 Cr. 692 (JMF)

Dear Judge Furman:

      The defendant in this case, Madars Jankevics ("Jankevics" or "the defendant"), is scheduled to be sentenced on March 8, 2019, having pled guilty to conspiracy to commit bank and wire fraud. The Government respectfully submits this letter in advance of the sentencing. In a plea agreement between the parties, the Government and the defendant stipulated to a United States Sentencing Guidelines range of 41 to 51 months' imprisonment (the "Stipulated Range"). For the reasons set forth below, the Government submits that a sentence within the Stipulated Range would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.[1]

    **A. Offense Conduct**

      This case involves a wire fraud and money laundering conspiracy carried out by a network of individuals located in the United States and overseas. The conspiracy has targeted victims principally through an internet-fraud scheme: a member of the conspiracy posts an advertisement for a car, boat, tractor, kitchen appliance, or similar big-ticket item for sale on the internet. (PSR ¶ 15.) These advertisements are typically posted on well-known websites involving either auctions or direct sales, such as eBay or Craigslist. (*Id.*) The conspiracy often fraudulently utilized the names, logos, and business pedigree of legitimate businesses to give the veneer of credibility to the advertisements, and take advantage of positive reviews attributed to the true businesses. (*Id.*)

      After a prospective victim makes an inquiry in response to an advertisement, the members of the conspiracy controlling the fake advertisements negotiate with the buyers, typically via email.

---

[1] In its Presentence Report (PSR), the U.S. Probation Office determined that a Guidelines Range of 51 to 63 months' applied to the defendant's conduct as a result of additional investigation following the signing of the plea agreement. (*See* PSR ¶ 100.) The Government nevertheless stands by its plea agreement and seeks a sentence within the Stipulated Range.

(*Id*. ¶ 16.) Again, the email addresses mimic or duplicate those of the legitimate businesses. (*Id*.) The conspirators and victims come to an agreement, at which point the conspirators provide wiring instructions to the victims. (*Id*.) Maintaining the illusion of legitimacy, conspirators suggest an arms-length transaction by directing victims to third-party bank accounts, which are either corporate or business accounts. (*Id*.) Those accounts are opened at the banks in the names of shell corporations established for the purpose of furthering the fraud. (*Id*.) Once recruited by the conspiracy, members responsible for the bank accounts are named as the principals of the shell corporations, and in turn open accounts at multiple banks to await transfer of victim funds as directed by the co-conspirators controlling the online advertisements. (*Id.*)

Victims then wire funds into the shell-corporation bank accounts, believing they are transmitting funds in order to, for example, purchase a classic automobile and pay for its transportation. (*Id*.) Next, conspirators who have established the bank accounts are alerted to the money transfers by other members of the scheme. Often on the day of, or immediately following, a victim transfer, members of the scheme controlling bank accounts begin withdrawing the victim funds. (*Id*. ¶ 17.) The withdrawals are made in cash, from both ATMs and the tellers at bank counters. (*Id*.) Participants in the scheme would be informed of the amount of the victim transfer, name of the victim, and the item these victims believed they would be purchasing. Such information would be needed in case bank employees inquired into the legitimacy of the transfer.

During this short period, victims are unaware that their funds are being drained, and the overriding goal of the conspirators is to take all the money before the funds can be frozen and otherwise stopped. To accomplish this, conspirators will withdraw funds from numerous bank branches in rapid succession, frequently on the same day. After funds are withdrawn, money is then distributed among the conspiracy in various ways, including via wiring, transfer to cryptocurrency, or physical transportation, principally from within the United States back to Europe. (*Id.*) Victims do not ever receive the items they believed they were purchasing, and are generally unable to recoup their funds once the money has been withdrawn from the accounts. (*Id.*)

Jankevics was a member of the conspiracy who opened accounts in his own name and the names of two shell corporations, which served as conduits for victim funds. (*See* PSR ¶¶ 18–36.) He was born in Kuldiga, Latvia. (*Id*. ¶ 70.) Jankevics entered the United States in February 22, 2017 on a tourist visa. (*Id*. ¶ 76.) Several days before his arrival, Truck Trial Corp. was incorporated under his name with New York State. (*Id.* ¶ 18.) The day after his arrival he opened a bank account at TD Bank in the name of the company. On April 11, 2017, Jankeyin Future Corp. was registered under his name. (*Id.* ¶ 32.) On May 20, 2017, Jankevics left the United States. (*Id.* ¶ 76.) He returned on September 7, 2017 and remained in the United States until his April 18, 2018 arrest. (*Id.*) Over the course of his time in the United States, he opened multiple accounts with at least five different banks. While in the United States, Jankevics wired several thousand dollars via Western Union and Money Gram to other members of the scheme, including co-defendants and fellow Kuldiga natives Martins Apskalns and Igors Pirins.

Over the course of his two stays in the United States, Jankevics was active in the scheme for a relatively long period of time and worked alongside scheme participants who operated out of the South Florida region. In addition, at least one co-conspirator listed Jankevics as a U.S.-based

point of contact in immigration paperwork completed in connection with entering the United States.

In addition to the many victim impact statements received by the Government in connection with the broader scheme, the Government has received two victim impact statements from direct victims of Jankevics. (*See* Ex. A.) These victim impact statements map the pattern seen across the case: innocent, everyday Americans believed in ostensibly legitimate online advertisements and realized only after they made the wire transfer to purchase their designated items that they were the victims of fraud. As one of Jankevics's victims writes in reference to an attempted purchase of an $11,000 oven: "This greatly impacted me and my family as we had saved for many years to purchase this oven for our home." This statement, along with the mass of statements received in connection with this case, reveal the very real and often tragic financial, and psychological costs to victims as a result of the conduct of the defendant and those like hm.

### B. The Plea and Guidelines Calculation

On August 18, 2018, Jankevics was arrested in Delray Beach Florida. (PSR ¶ 77.) On October 11, 2018, pursuant to a plea agreement, Jankevics pleaded guilty to conspiracy to commit bank fraud and wire fraud, as charged in the Indictment. (PSR ¶ 5.) The plea agreement provides for a Stipulated Range of 41 to 51 months' imprisonment based on an offense level of 22 and a criminal history category of I. (*Id.*)

### C. Discussion

#### 1. Applicable Law

As the court is aware, the Guidelines still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)    to afford adequate deterrence to criminal conduct;
    (C)    to protect the public from further crimes of the defendant; and
    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. A Guidelines Sentence Is Reasonable in This Case

The Government respectfully submits that a sentence within the Stipulated Range of 41 to 51 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing. Weighing the applicable factors under 18 U.S.C. § 3553(a)(2), it is clear that the seriousness of the offense, the history and characteristics of the defendant, and the need to promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public are all significant considerations in crafting a just sentence given the conduct at issue in this case. A sentence within the Stipulated Range acknowledges the most pernicious effects of the defendant's conduct and its impact on individual victims, promotes due respect for the laws designed to protect the financial security of both persons and institutions in the United States, adequately considers the defendant's history and characteristics, will serve to dissuade similarly situated conspirators and make more difficult the task of those implementing the scheme overall, protects the public at large, and most importantly will justly punish the defendant's behavior within this far-reaching and damaging conspiracy.

*First*, a significant prison sentence is necessary to reflect the seriousness of the defendant's conduct, to promote respect for the law, and to provide just punishment. The conspiracy outlined herein resulted in millions of dollars in losses to consumers. The victims of the conspiracy are, by and large, everyday Americans. As reflected in victim impact statements, many victims devoted considerable savings and emotional investment to their intended purchases – frequently classic cars.[2] Typically, these were not hyper-luxury items available only to those with a maximum quotient of disposable income, but collector vehicles pursued by those who sought to access the dreams and freedoms of their youth, or recall a bygone era. They sought cars or boats that connoted a sense of history, status, and sentiment: a 1949 Chevy Truck, a Ford Bronco, an Airstream trailer. Many of the victims have reported living on fixed or otherwise low incomes, saving funds, and waiting for the right opportunity, and nearly all describe their surprise at being taken in by a complex scam. The conspirators went to impressive lengths; far from a random, mass email conceit, the conspirators posted advertisements using real business identities, took pains to provide photographs, VIN numbers, registration information, insurance history, and detailed records about the cars in an effort to prove their authenticity and *bona fides* as dealers.

The defendant's role in the case was therefore critical. By lending his name to shell corporations and opening corporate banking accounts, the defendant played a crucial part in

---

[2] In addition to one statement attached as an exhibit hereto, additional victim impact statements have been submitted to the Court and counsel under separate cover.

convincing even careful victims to part with hundreds of thousands of dollars. Believing they were sending their money to a business – cloaked with a presumption of legitimacy – the victims did not suspect their money – and the seemingly legitimate individuals with which they were communicating – would disappear. The conspiracy therefore requires something more of participants like the defendant than that of a prototypical mule or courier. The defendant was required to take on a corporate identity, propagate that elemental falsehood across multiple financial institutions, and then act as the face of the conspiracy by entering the banks and withdrawing large sums through direct interactions with bank employees, explaining the funds had come from people, individuals whose names and intended purchases he needed to know should the bank employee ask.

The Government does not contend that the defendant was personally posting the ads or acting as the principal contact with the victims, but his role implicated fundamental and repeated misrepresentations to the banks and direct contact with the victims' funds, some of which he kept, and some of which he passed along to conspirators outside of the United States. Thus, the defendant was required by his role to be aware of new victims, their identities and intended purchases, and the times that they had opened themselves up to the fraud; it was the defendant's job to make sure the banks distributed that money as quickly as possible. Simply put, the fraud cannot be completed without front-line participants like the defendant.

Furthermore, unlike some co-defendants in this scheme, the defendant left the United States after a period and then returned to continue his role in the fraud scheme. This fact supports a sentence within the Stipulated Range. Not only did he defraud numerous victims, beginning just days after he arrived in this country, he left the country several months later, returned, and then continued his involvement in the scheme. Thus, his purported justification for his conduct — that he suffered from financial difficulties — falls flat against the real facts of his conduct: he took two opportunities to travel to the United States for extended periods of time, to engage in the fraud scheme, and to steal large amounts of money from numerous victims.

*Second*, the history and circumstances of the defendant warrant a sentence within the Stipulated Range. In his submission, the defendant writes about his time spent as a construction laborer in England beginning in early 2011 and ending upon his return to Latvia in 2012. (*See* Doc. No. 233 ("Def. Subm'n"), at 7.) However, a review of open-source information reveals that the defendant was charged with money laundering by law enforcement in Guernsey, United Kingdom. *See Egmont Cases: Financial Analysis Cases 2011–2013*, The Egmont Group of Financial Intelligence Units, at 124 (2014), *available at* https://egmontgroup.org/en/filedepot _download/2557/33. Specifically, as alleged in the Egmont report, Jankevics worked in furtherance of a money laundering scheme led by co-defendant Apskalns. *See id.* at 120. Generally speaking, the scheme involved obtaining stolen credit card information, using that information to purchase airline tickets or cellphone upgrades, and laundering the funds obtained from the fraudulent scheme. *See id.* at 121. Apskalns was convicted for his role in the scheme and sentenced to four years' incarceration. *Id.* However, Jankevics and two other co-defendants "absconded prior to being dealt with by the Royal Court of Guernsey." *Id.* Accordingly, while Jankevics was not convicted for his role in this scheme, at the very least, there seems to be a strong indication that Jankevics' two trips to the United States to engage in the instant fraud scheme do

not constitute the first time he has traveled to a foreign nation to defraud victims and help launder criminal funds.

*Third*, a sentence within the Stipulated Range is significant, and is necessary to afford adequate deterrence to both the defendant as well as others similarly situated. Both specific deterrence and general deterrence are highly relevant to the defendant's case. The defendant traveled twice to the United States to engage in months-long spans of uninterrupted fraud. It appears likely that this was not his first time traveling abroad to defraud unwitting victims and shunt the profits of that deceit overseas. A sentence within the Stipulated Range will make clear to the defendant that such behavior is unacceptable and to be met with serious punishment.

As for general deterrence, as is evidenced by the size of this case, the amount of loss to victims, and the number of victims, the crimes committed by the victim are both incredibly serious and all too common. A sentence within the Stipulated Range will help send a message to other individuals that taking part in such activity is not a risk-free enterprise.

In terms of comparing Jankevics against other members of the conspiracy that have been sentenced by the Court, the Government views Jankevics's culpability as most similar to that of Ivars Ozols, who was sentenced by the Court on February 12, 2019. However, the Government views Jankevics's behavior both preceding and during this conspiracy as more aggravating than that of Ozols. Specifically, as is set forth above, Jankevics was previously arrested for his involvement in a money laundering and fraud scheme in the United Kingdom. Jankevics also arrived in the United States months before Ozols, operated in furtherance of the fraud scheme in the New York City area, left the United States, and returned to commit additional fraud in the Miami area. For similar reasons, the Government views Jankevics as more culpable than Aleksandrs Mukans.

**D. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the Stipulated Range of 41 to 51 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: ___*Daniel Nessim*___
Daniel G. Nessim
Matthew J.C. Hellman
Emily A. Johnson
Assistant United States Attorneys
(212) 637-2486/2278/2409